GRIFFIN, J.,
concurring specially.
Although I agree that the order imposing sanctions is not reviewable by certiora-ri, it is a notable order- which represents an interesting lurch in the law; of spoliation that aficionados of that ever-expanding doctrine might like to be aware of.
Petitioner, Craftmaster, and Respondent, Mead, entered into a construction agreement in October 1997 for Mead’s construction of a building addition to Craft-master’s auto body repair and paint facility. The contract completion date was March 14,1998, but Mead did not complete construction until December 1998. Disputes arose between owner and contractor and Craftmaster refused to pay the contract balance because of its dissatisfaction with construction. On April 12, 1999, Mead filed suit against Craftmaster.
Craftmaster retained the Scales Company of Brevard, Inc;, a construction services firm, to do an evaluation of Mead’s contract performance. On June 21, 1999, *1254 Scales supplied Mead with its “Investigative Inspection Report”, which included, inter alia, a summary of discrepancies and estimated correction costs. The only aspect of the project that is relevant to the petition is item No. 14:
Sheet C-5 includes the required profiles for the retention area on the north side of the building. This is not constructed with the slopes detailed. The steep slopes provided are susceptible to erosion, thus undermining the foundation. This should be re-graded and resodded to meet specifications per plans.
On August 2, 1999, counsel for Mead wrote Craftmaster’s counsel a letter reporting that he had received a copy of the Scales Company report and requested permission to inspect the items referenced.
On August 25, 1999, Atlantic Testing Laboratories, Inc. sent an engineer to the project at the request of Craftmaster to ascertain the probable cause of a crack in the floor slab. Mr. Swarr, Atlantic’s engineer, described the crack as running parallel to the wall adjacent to the retention area, about two feet in at what he assumed was the “end of the turndown slab,” which “typically is where they crack if you have a settlement problem.” The crack varied in width from an eighth to a quarter inch. Atlantic’s report, dated August 26, attributed the crack to settling of the foundation caused by the excessive slope of the retention area. Atlantic recommended that the footing of the wall be underpinned along the length of the retention area. In September, Craftmaster obtained a proposal from John Schopke, Inc., [“Schopke”] a foundation repair and soil stabilization contractor to do the underpinning for $11,400.00.
Two months later, on November 2,1999, Mead made its inspection of the project. Present for Mead were: Brian Mead; Counsel for Mead; Terence Myers, the project engineer; and Lisa Lombardi, the architect. Mr. Mead testified that he did not observe the crack. There is no explanation as to why these experts did not observe the crack in the slab or make any investigation to determine whether the foundation may have been undermined, since the record is clear that a crack in the slab is the most common way to detect the undermining of a foundation. In January 2000, Craftmaster contracted with Schopke to do the work referenced in its September 1999 proposal and the work was completed the following month.
Eight months later, in October 2000, Craftmaster filed its counterclaim and third-party claim. In it, they included a claim for the underpinning. This was evidently Mead’s first notice that Craftmaster had done corrective underpinning. According to the testimony of Mead’s principal, Brian Mead, upon receipt of the counterclaim, discovery was propounded to Craftmaster. This is the first indication in the record before this court of any discovery requests directed to Craftmaster. There is no suggestion in any of the filings that Craftmaster ever failed to respond to any discovery request propounded since commencement of the suit in April 1999.
Nevertheless, Mead filed a motion for sanctions against Craftmaster claiming that by underpinning the slab and repairing the slope of the retention pond without first notifying Mead that Craftmaster intended to assert a claim for structural cracks in the slab and by not informing them in advance of the corrective work being performed in February 2000, “Mead, Lombardi and Myers [would be] unable to counter the testimony of ... any witnesses present during the work who will testify about what they saw while the work was ongoing when the area beneath the slab was visible.” Mead argued to the court that there was “no reason” why they “shouldn’t have told us.” Counsel ac *1255 knowledged that the case was “very adversarial between the parties,” but Mead nevertheless urged that they were entitled to be informed of and be given access to the repair work because “the playing field has to be leveled” and because, otherwise, “basic fairness is not present.” In other words, Craftmaster could not repair the construction defect without fully informing the contractor who had failed to make the repair and giving them the opportunity to observe and document the repair.
The trial court accepted this argument and found that Mead had been “substantially impaired in defending [Craftmas-ter’s] claim because of [Craftmaster’s] intentional destruction of evidence,” i.e. making the repair, (emphasis added.) The court found that there had been no “emergency” to make the repairs and that the subsurface conditions prior to the repair could not be ascertained by a post-repair examination. The court precluded Craft-master from testifying about any observations made after removal of the slope or any of the work done by Schopke in repairing the foundation.